**Robert M. BOGAN and Scott M. Bogan, Plaintiffs,**

**v.**

**NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY and Austin E. Hodgkins, Jr., Defendants.**

**No. 91 Civ. 2221 (WCC).**

United States District Court, S.D. New York.

Sept. 29, 1995.

Doar Devorkin & Rieck, New York City, for Plaintiffs; Michael S. Devorkin, of counsel.

Schnader, Harrison, Segal & Lewis, Philadelphia, Pennsylvania, for Defendant Northwestern Mutual Life Insurance Company; Peter Jason, of counsel.

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Robert M. Bogan ("Bogan") and Scott M. Bogan bring this suit against Northwestern Mutual Life Insurance Company ("NML") and Austin E. Hodgkins, Jr. ("Hodgkins") for state and federal antitrust violations, breach of contract, violating New York General Business Law § 349, defamation, conversion, tortious interference with existing and prospective contractual relations, fraud, and breach of fiduciary duty. Before the Court are defendant NML's objections pursuant to Rule 72(a), Fed.R.Civ.P., to the June 27, 1995 oral ruling of Magistrate Judge Fox ordering production of certain documents generated by NML concerning a potentially related disability insurance claim filed by Bogan. For the reasons stated below, we decline to modify or set aside any portion of that order.

## BACKGROUND

NML is a mutual life insurance company that markets its insurance and annuity products through a two-tier system. First, general agents, under contract with NML, solicit applications for NML life insurance and annuities in specified territories. Second, the general agents each have discretion to create district agencies within their respective territories and to assign each district to a district agent. Like the general agents, the district agents operate as independent contractors under a license to solicit applications for NML life insurance and annuity products. In addition to receiving commissions on policies that they personally sell, the district agents receive commissions and/or fees on policies sold by soliciting agents that they recruit and train.

Until June 4, 1990, Bogan was a district agent pursuant to a agency contract (the "Contract") with defendant Hodgkins. On May 29, 1990, Hodgkins gave Bogan 30-days notice of termination of the Contract. Subsequently, after Bogan allegedly refused to allow several soliciting agents under his employment access to certain files, on June 4, 1990 Hodgkins terminated Bogan for cause, effective at the close of that business day. Later in June, Bogan filed suit in state court

alleging wrongful termination and various related claims. After the state court dismissed the action in February, 1991, Bogan filed the instant suit in federal court.

Prior to his termination, in April, 1990 Bogan applied for and received additional life and disability insurance from NML. On or about July 27, 1990, Bogan submitted a claim for disability benefits in which he asserted that he had been disabled, either partially or totally, since December 1, 1989 as a result of psychological stress related to his work environment, for which he claimed to have been receiving treatment.

Although ultimately paying Bogan over $300,000 pursuant to the policy, NML apparently denied a portion of his disability claim. Therefore, in February, 1991, Bogan submitted a formal complaint to the New York Insurance Department (the "NYID"), contesting NML's denial of coverage. As a result of Bogan's claim, NML generated certain documents at issue in the instant dispute. They include a summary of Bogan's complaint to the NYID, various communications between NML and doctors that NML retained in evaluating Bogan's claimed disabilities, and communications between NML and Hodgkins and other witnesses in the case.

In April, 1992, plaintiffs served deposition subpoenas on Dr. Paul Nassar and Dr. Ann Winton, a team of psychologists who had examined Bogan on behalf of NML. NML moved to quash those subpoenas claiming that the subpoenas would require disclosure of privileged material. On May 18, 1992, Magistrate Judge Fox granted NML's motion, noting that "[t]he examinations clearly ... were in anticipation of litigation in the disability case for the purpose of evaluating the disability claim." *Bogan v. Northwestern Mutual Life Ins. Co.,* No. 91–Civ–2221, trans. at 14 (S.D.N.Y. May 18, 1992).

Similarly, in September, 1993 plaintiffs sought "all documents relevant to the disability claim." Magistrate Fox directed NML to produce any documents "that Northwest Mutual intended to offer in this lawsuit on the

issue on any claim disability on the part of Mr. Bogan," but otherwise denied plaintiffs' request. *Bogan v. Northwestern Mutual Life Ins. Co.,* No. 92–Civ–2221, trans. at 22–23 (S.D.N.Y. Jan. 24, 1994). Now plaintiff has again sought discovery of all documents generated by NML pursuant to Bogan's disability claim. Although NML has apparently produced some of those documents, they claim that others are shielded from discovery by the work-product doctrine.

On June 27, 1995, after examining the documents that NML asserted were covered by the doctrine *in camera,* in a ruling from the bench Magistrate Fox ordered NML to turn over the entire disability file.[1] Noting that NML partially paid Bogan's claim and that many of the documents in question referred to the handling of that claim, Magistrate Fox found that the documents were prepared in the course of administering Bogan's claim rather than in anticipation of litigation. Magistrate Fox reached that conclusion notwithstanding and without reference to his two prior rulings restricting discovery relating to the disability claim.

Within the requisite time, NML filed an objection with this Court to Magistrate Fox's discovery order pursuant to Rule 72(a), Fed. R.Civ.P. NML claims that 1) Magistrate Fox's order is inconsistent with his prior rulings; 2) that he erroneously determined that because NML administered a portion of Bogan's claim, all documents in the file were produced in the course of administering that claim and not in anticipation of litigation, and; 3) that the documents in question were prepared in anticipation of litigation. We will address each of these arguments below.

## DISCUSSION

The work-product doctrine, embodied in Rule 26(b)(3), Fed.R.Civ.P., is a judicially created mechanism to prevent a party to a lawsuit from receiving the benefits of an opposing counsel's preparations for trial. *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947). Al-

---

**1.** A copy of that order is attached as Appendix A. Magistrate Fox did determine that a document dated April 13, 1992 was not relevant. That

portion of Magistrate Fox's ruling is not in issue here.

though its protection extends to all documents prepared in anticipation of litigation, "[a]t its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975).

▮ As a threshold matter, the party seeking concealment behind the work-product shield must establish that the documents at issue were prepared in anticipation of litigation. *Matter of Grand Jury Subpoenas,* 959 F.2d 1158, 1166 (2d Cir.1992). While this requirement does not limit protection to documents prepared in the course of an on-going litigation against the specific party seeking discovery, the documents must have been prepared at least with "an eye toward litigation." *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 47 F.R.D. 334, 337 (S.D.N.Y.1969).

▮ The "in anticipation" requirement involves a consideration of causation—that is, whether the documents were prepared *because of* impending litigation or for other business purposes. *Harper v. Auto–Owners Ins. Co.,* 138 F.R.D. 655, 660 (S.D.Ind.1991) ("... material must have been produced because of [the] prospect of litigation and for no other purpose."); Rule 26(b)(3) (advisory committee note) ("Materials assembled in the ordinary course of business ... or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision.").

As professors Wright and Miller explain: Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already a prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

8 Charles A. Wright et al., Federal Practice and Procedure § 2024 (2d ed. 1994); *see also Binks Manufacturing Co. v. National Presto Indus. Inc.,* 709 F.2d 1109, 1118–19 (7th Cir. 1983). As this passage indicates, determining whether the "in anticipation" requirement has been satisfied involves the resolution of factual issues concerning the circumstances surrounding the creation of the documents in question.

▮ In the instant case, Magistrate Fox determined that NML failed to meet its burden of demonstrating that the documents in question were prepared in anticipation of litigation. We note that a magistrate's resolution of pretrial discovery disputes is entitled to substantial deference and may not be disturbed by a district court absent a finding that the determination was "clearly erroneous or contrary to law." Fed.R.Civ.P. 72(a); *Dubin v. E.F. Hutton Group Inc.,* 125 F.R.D. 372, 373 (S.D.N.Y.1989); *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525, *cert. denied,* 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990). As long as Magistrate Fox's ruling finds any reasonable support in the record, we will not overturn it. Under this deferential standard we decline to alter or set aside Magistrate Fox's ruling.

As articulated above, the "in anticipation of litigation" requirement is a fact-intensive inquiry that can only be established on a document-by-document basis. To reach his conclusion, Magistrate Fox examined *in camera* each of the documents involved in light of the facts surrounding their creation. Under our deferential standard or review, we are not permitted to second guess his findings. We must only examine whether they find reasonable support in the evidence.

Magistrate Fox apparently based his ruling on two observations: 1) that NML was processing and paying a portion of Bogan's claim concurrently with the creation of the documents, and 2) that many of the documents indicated on their face that they were prepared for the purpose of administering Bogan's claim. We think that these findings support a reasonable conclusion that the documents were not prepared in anticipation of litigation.

Investigation and evaluation of insurance claims is the regular, ordinary, and principal business of insurance companies. *Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420, 422 (S.D.N.Y.1981). Although at some point a company's investigation may shift from the ordinary course of business to an anticipation of litigation, there is no hard an fast rule as to when this occurs. *Westhemeco Ltd. v. New Hampshire Ins. Co.*, 82 F.R.D. 702, 708 (S.D.N.Y.1978), *modified on other grounds*, 484 F.Supp. 1153 (S.D.N.Y. 1980). Instead, it is a fact-specific determination. Here, the line dividing claim administration from litigation is blurred further by the fact that, although some facts indicate that NML would reject Bogan's claim in part, it continued to pay a portion of the claim at the time the documents were generated. Given this fact, we do not find Magistrate Fox's ruling clearly erroneous.

NML argues vehemently that because Bogan had not cooperated in the administration of his claim,[2] because his disability application contained inconsistent information, because he had filed a claim with the NYID, and because of the current pending litigation, it clearly anticipated litigation surrounding the disability claim. NML cites numerous cases in the insurance context indicating that once litigation is likely, documents prepared thereafter are shielded from discovery. *See Carver v. Allstate Ins. Co.*, 94 F.R.D. 131, 134 (S.D.Ga.1982); *Westhemeco*, 82 F.R.D. at 708; *Fine*, 91 F.R.D. at 422; *McFadden v. Norton Co.*, 118 F.R.D. 625, 632 (D.Neb. 1988); *Landmark Ins. Co. v. Beau Rivage Rest.*, 121 A.D.2d 98, 101–02, 509 N.Y.S.2d 819, 822–823 (N.Y.1986).

These cases are unavailing because they primarily focus on the reasonableness of the anticipation of litigation. *See Harper*, 138 F.R.D. at 662. While we agree with NML that the prospect of litigation may have been "reasonable" when the documents in issue here were created, it must still satisfy the "causation" element. This requirement is not excused merely because the prospect of litigation had arisen by the time some of the documents were created. If they were creat-

ed, among other reasons, for the processing of Bogan's claim, there were not prepared solely in anticipation of litigation and are therefore not protected by the work-product shield. This issue of causation is a fact-specific inquiry into the purpose that motivated the creation of the documents. We cannot say that Magistrate Fox's conclusion that the documents were not prepared "because of" the prospect of litigation was wholly unsupported by the facts.

■ NML also contends that Magistrate Fox erroneously concluded that, absent a complete denial of Bogan's claim, no documents could be shielded by the work-product doctrine. While we agree that this principle in the abstract is not necessarily a correct interpretation of the work-product rule, the fact that there has not been a complete denial is a factor to consider. *State Farm Fire & Casualty Co. v. Perrigan*, 102 F.R.D. 235, 239 (W.D.Va.1984). Moreover, we do not think that Magistrate Fox's decision rests solely on this observation. Instead, Magistrate Fox considered both the existence of on-going claim administration and the indication contained in many of the documents that they were prepared pursuant to that administration in reaching his holding. While NML has presented ample evidence that it viewed Bogan's disability claim as suspicious, and that it ultimately anticipated litigation as to its merit, because there is evidence that the documents were not prepared due to that anticipation, we will not upset Magistrate Fox's order.

■ Finally, NML argues that because Magistrate Fox's ruling is apparently inconsistent with two prior rulings in 1992 and 1993 restricting discovery of documents surrounding Bogan's examination by Drs. Nassar and Winton, it cannot stand. We do not agree. Nothing in the record indicates that those prior, general determinations were made in light of an examination of the documents at issue here. However, the "in anticipation" inquiry can best be made only after considering the documents themselves and the facts surrounding their preparation.

---

**2.** NML asserts that Bogan, on the advice of his counsel, refused to turn over his tax returns for the relevant period, an allegedly routine procedure in claim administration.

Those facts support Magistrate Fox's holding. Moreover, as articulated above, just because litigation was a real possibility does not necessarily preclude a finding that a document was not prepared *because of* that possibility.

## CONCLUSION

For the foregoing reasons, we decline to alter or set aside the June 27, 1995 order of Magistrate Judge Fox. NML is directed to provide plaintiffs with the documents indicated in that order.

**SO ORDERED.**

## APPENDIX

## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

BOGAN, Plaintiff,

v.

NORTHWESTERN MUTUAL, Defendant.

Case No. CV–91–2221

White Plains, New York
June 27, 1995

CIVIL CAUSE FOR STATUS CONFERENCE BEFORE THE HONORABLE MARK D. FOX UNITED STATES MAGISTRATE/JUDGE

APPEARANCES:

For the Plaintiff: Michael Devorkin, Esq.

For the Defendant: Peter Jason, Esq. Schnader, Harrison, Segal & Lewis 1600 Market Street Philadelphia, Pennsylvania 19103 215–751–2000

Operator, Jerome Grate
Accurate Transcription, 144 Bay 8th Street, Bklyn, NY 11228 718–232–4810
Proceedings recorded by electronic sound recording.
Transcript produced by transcription service.

THE COURT: Alright. The plaintiff, Bogan, claims by his June 7th letter brief that anything which supports the plaintiff's claim of a stress disability and/or which establishes his truthfulness which exists in the disability file would be relevant. Plaintiff asserts that there was a waiver of the privilege claim under Rule 46(e)(1) by a failure to earlier assert the privilege claim.

The claims of both sides with reference to timeliness and waiver are rejected in view of the complexity of the litigation, the volume of discovery and the fact that the focus has somewhat shifted during the course of discovery. In order to be immune from discovery, the information must be shown to have been prepared exclusively for litigation and not in the regular course of the disability insurance carrier's business of investigating and administering, and deciding claims for disability. In making these rulings, I am, of course, not deciding on relevance or materiality for trial purposes on any issue, but I am deciding these strictly under the definition of relevance for discovery purposes and to avoid surprise.

Since the issue of whether or not Mr. Bogan performed his employment contract as an agent for Northwestern Mutual as retired by the contract has been framed, the information in the disability file is reasonably calculated to lead to the discovery of admissible evidence. The documents in the file—and I've read them—relate to Northwestern Mutual's evaluation of the plaintiff's disability claim. These files were all created by the disability benefits department of Northwestern Mutual, a different department from that in which the plaintiff was employed. The people involved in the administration of the claim and the creation of the documents—in numerous places throughout the documents—state that they are working on the evaluation and administration of the claim. Mr. Bogan was claiming disability for employment by making his claim which he filed in July of 1990. The fact that the employment from which he was claiming he was disabled was with Northwestern Mutual, the same entity involved as the plaintiff in the lawsuit because they were his employer, is happenstance as far as the administration and the investigation of the disability claim is concerned. Even had Mr. Bogan been employed by some other entity, a disability claim would certainly have been investigated by the carrier and administered pursuant to

the regular course of the carrier's business. The big distinction here, of course, is that because the same entity is involved as the defendant in the litigation, and that same entity was also the disability insurance carrier, the disability claims records are available to defense counsel and at this point exclusively available.

I've gone through the privilege log and I'll go through the items one by one. First of all, the June 11, 1991 complaint summary is not protected by work product, nor is the November 13, 1990 claim approval and the phone file memo of a conversation between Gross and Hodgkins. The same ruling applies to the October 11, 1990 memo to Wanda Zitschkie from Jim Porter in the policy benefits department. Mr. Robert Slocumbe was apparently an associate of the plaintiff's. Is that right?

MR. DEVORKIN: Yes, he was a salesman.

THE COURT: The letter from Slocumbe to David Gross regarding Mr. Bogan and the identities of witnesses also appears to be directly related to the administration and investigation of the disability policy and is not protected by work product, nor are the three September 20, 1990 link grams which are listed next on the privilege log. I note that with reference to the link gram from David Gross to Kent Bibi regarding the source of information in the administration of the claim on Bogan, the document itself which is dated September 20, 1990 says "As we administer a claim on Mr. Bogan ..." directly indicating on the very face of the document that it has to do with the administration of the disability claim file, it is certainly within the regular course of business of the disability carrier.

The next page of the privilege log lists three items; September 12th, August 22nd, and August 8, 1990. These are also not protected by work product. I note again, specifically, that one of the documents says that Northwestern Mutual is reviewing, investigating and evaluating Bogan's disability as they're required to do in the regular course of business.

The next page contains documents dated November 26, November 6, October 10, October 4, September 25 and September 24, all of 1991. All of these must be disclosed. They are not protected by work product.

The next page is an August 23rd letter to a physician regarding a psychiatric evaluation and it's from Wanda Zitschkie, a specialist in the policy benefits department. That document specifically contains this language—I apologize for the limited amount of medical information. This has contributed to our difficulty in determining the extent of Mr. Bogan's disability—Clearly, Ms. Zitschkie was involved in evaluating this claim at this point in time. And that was on August 23, 1991.

The next page of the privilege log ...

MR. JASON: Your Honor, I'm sorry. Are you saying that has to be disclosed?

THE COURT: It has to be disclosed.

The next page contains documents of July 8, April 28, June 17, and again, April 28, 1992.

MR. DEVORKIN: Your Honor, can I just ask one question. The page before that, that was the only document on the page?

THE COURT: That was the only document on the page.

All of these items are in 1992. All of these, again, are not work product. I will read specifically from the June 17th letter from Mr. Gosse to the doctor in question which reads on the very last line with reference to Mr. Bogan, if Mr. Bogan refuses to speak to another health care professional, the letter says "Then Northwestern Mutual will have to come to a decision on the status of this claim with the information in it's file and without the additional input of the named doctor." That is dated June 17, 1992. Clearly, even at this point the carrier was continuing to evaluate the claim and that, I find, was in the course of it's regular course of business.

The next page of the privilege log contains a document dated April 13, 1992. With reference to that one, it has to do with a telephone call and there is mention in there of a subpoena. I don't see anything in that par-

ticular document which indicates that it would be relevant. The remaining items on that page are an undated message, an April 6, 1992 fax cover sheet, an April 3, 1992 letter from Zitschkie to a health care professional, March 31, 1992 memo regarding a telephone call from Zitschkie to one of the health care professionals, a March 26, 1992 phone memo from somebody named Lora in the disability department re: a phone call with a health care professional, and a February 27, 1992 file memo from Mr. Gosse regarding a discussion with Bogan on authorization to obtain medical information. That document contains the following information, and this again, is a document which is dated February 27, 1992 "I explained that we could reconsider the frequency of forms until after the examination was completed and it was determined that benefits continued to be due." It goes on in the next paragraph to say "I told him my focus was on the administration of this claim." The next paragraph down contains this language. "We are not aware of any statute or insurance code in New York that requires an insurance company in the administration of a disability income claim to turn over information obtained." And in the next paragraph, apparently attributing this to Mr. Bogan, he said "While he understands I am trying to administer his claim, he hopes that I could understand what's going through his mind." Here, again, it appeared that the entire focus of the activity that is reported in the document had to do with the administration of the claim.

The next page contains six documents ...

MR. DEVORKIN: Your Honor, you're saying everything but the ...

THE COURT: Everything is to be turned over. There's nothing here that's protected except for the one item having to do with subpoenas.

The February 14, 1992 memo from Zitschkie regarding a conversation with a health care professional also contains this line "He started to tell her—her, being the professional—about the lawsuit and she told him it was none of her concern." This again confirms to my reading that the entire focus of the activi-

ty which is covered by this file had to do with the administration of the claim which was part of the regular course of business of a disability insurance carrier and is not protected by work product.

The remaining items on the page, a February 6th coversheet, a February 4—all 1992—1992 phone memo from David Gosse regarding conversations with Mr. Bogan and one of the doctors; a fax copy of one of the doctor's notes dated January 27, 1992; a phone memo dated January 27, 1992 from Wanda Zitschkie, who, again is a specialist in the benefits department regarding her conversations with one of the doctors having to do with Mr. Bogan's testing; and a January 21, 1992 phone memo from the same specialist also regarding conversations with a physician. All of those were part of the administration of the policy are not protected by work product.

The final page of the privilege log contains documents dated January 9, 1992, January 10, 1992, and December 26, 1991. The author of all of these documents was again, Wanda Zitschkie, and all these also had to do with the administration of the disability claims filed.

Now, under the circumstances and for the reasons which I have set forth, none of this information is protected and it all should be turned over. Because of the nature of the litigation and because of all the objections that have been previously filed and ruled upon in discovery in rendering this decision, I have specifically not named any of the witnesses involved. My feeling about that is in order to preserve confidentiality in the event that the defendants wish to file objections, I will direct that no disclosure be made for 10 days to allow the filing of objections if the defendants wish to file them.

With reference to the request that was placed on the record here regarding further discovery, it would seem to me that all three parties ought to get together an decide what course this litigation is going to take. If the plaintiff intends to contend in the litigation that he was disabled and intends to call any witnesses in that regard, it would seem to me that you're going to need to disclose that because it will certainly involve expert testi-

mony and that's going to entail a very, very brief reopening of discovery—and I'm talking about a matter of a couple of weeks and no more—in order to complete whatever other discovery needs to be done. My primary focus is to avoid surprise and to get all the loose ends nailed down so when the case comes to trial they'll be no other outstanding issues for the trial judge to have to deal with.

That constitutes my decision with reference to the privilege matter and as I've indicated, counsel have 10 days to file objections. If you wish to file objections you'll need to order this record on an expedited basis, this record constituting the decision in the matter.

MR. JASON: Your Honor, on that point, I think Your Honor has in the past given parties 10 days from receipt of the expedited transcript.

THE COURT: The statute says 10 days. There's some case authority that indicates 10 days from the time that you get the decision. The decision is on the record. My feeling would be—it certainly would not be my intention to bind the district judge—if you order the record on an expedited two-day basis today, my view would be that you've got 10 days from when you receive the record.

MR. JASON: I think that's consistent with Your Honor's prior rulings.

THE COURT: I also want to give you a control date to check in. I think we can probably do it by conference call. This case is now assigned to Judge Parker. If I set a conference call up for the third week in July, is that going to interfere with anybody's vacation plans or anything like that?

MR. JASON: The week of the 17th, I right now have out-of-town depositions that week but if we're talking about an early morning ...

THE COURT: I was, frankly, thinking of the 20th at 8:30 or 8:45 unless that works a hardship on anybody.

MR. JASON: If we could do it at 8:30, Your Honor, because that is a deposition day for me.

THE COURT: Is that O.K. with you, Mr. Devorkin?

MR. DEVORKIN: Fine, Your Honor.

THE COURT: O.K. with you?

MR. BERKELHAMER: I think it will be, Your Honor.

THE COURT: That will be by conference call. The new number is 914–390–4124. July 20th on Thursday.

Alright, gentlemen, thank you very much.

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Carla Nutter
CARLA NUTTER
Signature of Transcriber

7/10/95
Date

